**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SUSAN KANE, | CASE NO. 3:13-cv-02469-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 14, 15,16, 17 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Susan Kane for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). The ALJ found that Plaintiff was entitled to supplemental security income ("SSI"), but not DIB, because Plaintiff did not become disabled until 2010. To receive DIB, Plaintiff had to establish disability prior to her "date last insured," which was March 31, 2006. At the hearing, the ALJ elicited testimony from a medical expert, who opined that she was not disabled in 2003, her alleged onset, in 2006, her date last insured, or at the time of the hearing. The ALJ credited this decision with regard to her alleged onset and date last insured, but credited the opinion of a consultative examiner that

she was disabled as of 2010. Plaintiff asserts that the ALJ should have relied on the consultative examiner to find that she was disabled before March 31, 2006. However, the consultative examiner declined to opine as to Plaintiff's past diagnoses and functioning, because she only had the benefit of a one-time examination. In contrast, the medical expert who testified at the hearing had the benefit of reviewing Plaintiff's prior medical records. Plaintiff asserts that these medical records support a finding that she was disabled on March 31, 2006, but the ALJ was entitled to rely on the opinion of the medical expert. Under the deferential substantial evidence standard of review, the Court is bound to accept the reasonable conclusions of the ALJ. Here, a reasonable mind could accept the medical expert's testimony and other evidence as adequate to conclude that Plaintiff was disabled before March 31, 2006. Substantial evidence supports the ALJ's decision that she was not entitled to DIB. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On January 21, 2010, Plaintiff filed an application for DIB and SSI. (Tr. 160-69). On October 18, 2010, the Bureau of Disability Determination denied these applications (Tr. 78-90), and Plaintiff filed a request for a hearing on November 2, 2010.  (Tr. 93-94). On January 30, 2012, an ALJ held a hearing at

which a vocational expert, a medical expert, and Plaintiff—who was represented by an attorney—appeared and testified. (Tr. 24-55).  On April 20, 2012, the ALJ found that Plaintiff was entitled to SSI, but not DIB. (Tr. 6-23). On May 11, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 4-5), which the Appeals Council denied on July 31, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-3).

On September 27, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On February 24, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 14, 15). On April 9, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 16). On May 9, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 17). On November 5, 2014, the case was referred to the undersigned Magistrate Judge.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also*

*Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.   If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on February 24, 1961, and was classified by the regulations as a younger individual through the date last insured. (Tr. 29). 20 C.F.R. § 404.1563. Plaintiff graduated from college and has past relevant work as a cashier and a childcare attendant. (Tr. 50).

Prior to her alleged onset date, Plaintiff treated with Dr. Carol March, Ph.D., from 1996 to 1997. (Tr. 244-49). Plaintiff was also treated with one-hour long psychotherapy sessions with Dr. Richard R. Silbert, M.D., at Behavioral Healthcare Center, P.C. ("Behavioral Healthcare") from August 4, 1997 to December 4, 1997, and was discharged on December 5, 1997. (Tr. 537, 544).

Two years later, she returned to Dr. Silbert for psychotherapy sessions and medication management once or twice per month beginning from February 17, 2000 through November 29, 2000. (Tr. 546-562). She was diagnosed with "DSM IV 296.23, 300.15, and 301.83."[1] (Tr. 537-562).

After a year's gap in treatment, Plaintiff had an "art therapy session" with Frank Goryl, MA at Behavioral Healthcare on October 29, 2001. (Tr. 563). Her diagnoses were "DSM IV 311, 301.4, 300.02."[2] (Tr. 563). Plaintiff returned to Dr. Silbert on November 5, 2001, for psychotherapy and medication. (Tr. 564). On

---

[1] These codes are for diagnoses of "Major Depressive Disorder, Single Episode, Severe Without Psychotic Features," "Dissociative Disorder [not otherwise specified]," and "Borderline Personality Disorder." *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition (1994), §§296.23, 300.15, 301.83.

[2] These codes are diagnoses for "Depressive Disorder, [not otherwise specified]," "Obsessive-Compulsive Personality Disorder," and "Generalized Anxiety Disorder." *Id.* §311, 301.4, 300.02.

December 4, 2001, Plaintiff had a half-hour telephone consultation with Dr. Silbert. (Tr. 565). She had two psychotherapy and medication management sessions with Dr. Silbert in December of 2001. (Tr. 566-68). She had a half-hour phone consultation with Dr. Silbert on January 18, 2002. (Tr. 573).

On January 21, 2002, Plaintiff had an "art therapy session" with Mr. Goryl. (Tr. 568). Plaintiff had three psychotherapy and medication management sessions and one phone consultation with Dr. Silbert during 2002.[3] (Tr. 574-583). The record does not contain any subsequent records for Dr. Silbert.[4]

From October 23, 2002 to May 6, 2005, she was prescribed a combination of psychotropic medications from Geisinger Family Practice. (Tr. 584-593). As of May 6, 2005, her medications for mental impairments were Seroquel and Lexapro. (Tr. 584). As of November 22, 2006, her medications were Xanax (alprazolam) and Lexapro. (Tr. 534).

On November 11, 2005, Plaintiff was seen at McAndrew-Haley Family Practice ("Family Practice") for respiratory problems. (Tr. 335). On exam, she was not depressed or anxious. (Tr. 335). Her diagnoses included Borderline Personality Disorder. (Tr. 335). On April 13, 2006, Plaintiff was seen at Family Practice for lower extremity pain. (Tr. 335). On exam, she was alert and was not anxious or

---

[3] Plaintiff saw Dr. Silbert on June 25, 2002, July 15, 2002, and August 26, 2002 and had a phone consultation on November 26, 2002. (Tr. 574-583).
[4] Records from Dr. Silbert were unavailable because he moved out of the area and could not be located. (Tr. 27-50).

depressed. (Tr. 335). She denied fatigue, sleep problems, and appetite problems. (Tr. 335).

On March 10, 2006, Plaintiff had an evaluation with a chiropractor, Dr. Carl O'Hara, D.C. (Tr. 239). She referred to herself as a "homemaker/teacher" and she had been referred by her hairstylist. (Tr. 259). She reported that back pain was interfering with her sleep. (Tr. 259). She continued treating with him through August of 2009 for back pain. (Tr. 266).

On July 17, 2006, Plaintiff was treated for respiratory problems at Family Practice. (Tr. 334). On exam, she was not anxious or depressed, and she denied fatigue, sleep, or appetite problems. (Tr. 334). Her medications were Lexapro and Seroquel. (Tr. 334). On October 19, 2006, she was treated for respiratory problems and diagnosed with tobacco abuse. (Tr. 333). She was started on Chantix. (Tr. 333). On April 19, 2007, Plaintiff followed-up for respiratory problems. (Tr. 333). She had stopped the Chantix treatment. (Tr. 333). She reported fatigue, but indicated no problems with sleep or appetite. (Tr. 333). On exam, she was not anxious or depressed. (Tr. 333). On October 15, 2007, she was treated for respiratory problems. (Tr. 332). She reported fatigue, but not problems with sleep or appetite. (Tr. 332). On exam, she was not anxious or depressed. (Tr. 332).

On February 14, 2008, Plaintiff was treated for respiratory problems at the Family Practice Center. (Tr. 331). She reported fatigue and problems with her

appetite, but no problems with sleep. (Tr. 331). On exam, she was not anxious or depressed. (Tr. 331). At a follow-up on February 21, 2008, she reported decreased appetite and increased depression. (Tr. 331). On exam, she was not anxious. (Tr. 331). On September 28, 2008, Plaintiff was treated for respiratory symptoms. (Tr. 330). Depression is not mentioned, she denied fatigue, sleep, and appetite problems, and on exam she was not anxious. (Tr. 330).

In 2009, Plaintiff began to complain of back impairments, and imaging indicated disc disease and spinal canal stenosis. (Tr. 500). On July 20, 2009, she followed-up at Family Practice and reported that she was not sleeping due to pain. (Tr. 329). However, she was "active" and denied fatigue or appetite problems. (Tr. 329). She denied depression, anxiety, anger, moodiness, and problems with memory or concentration. (Tr. 329). On August 27, 2009, she again denied depression, anxiety, anger, moodiness, and problems with memory or concentration. (Tr. 328). On September 17, 2009, she reported that she was the "same" as the visits on June 20, 2009 and August 27, 2009, but continued to experience pain. (Tr. 327).

On September 24, 2009, Plaintiff had a psychiatric evaluation with Dr. Satish Malik, M.D. (Tr. 519-20). She reported that her doctor had left the area and he "recommended she should come see us." (Tr. 519). She reported struggling with anxiety and depression, but that she had "been taking Lexapro and Xanax for years

now" and was "doing well." (Tr. 519). She indicated that she had depression, anxiety, irritability, and difficulty in her relationship with her husband, but that "since she has been taking medicine that has helped her." (Tr. 519). She denied psychotic symptoms and her sleep and appetite were good. (Tr. 519). Her mood was "somewhat anxious." (Tr. 519). She denied delusions and hallucinations and her cognitive function, impulse control, insight and judgment were intact. (Tr. 520). He assessed her to have a global assessment of functioning ("GAF") of 55-60 and diagnosed her with Major Depressive Disorder, recurrent, without Psychotic Features and Generalized Anxiety Disorder, not otherwise specified. (Tr. 520).

Plaintiff saw Dr. Malik about once a month for fifteen minutes. (Tr. 515-18). On October 29, 2009, Plaintiff reported to Dr. Malik that she was "somewhat anxious and worried" about an upcoming surgery, she was otherwise "doing alright." (Tr. 518). Notes indicate that "things are going well at work so the patient is happy about that." (Tr. 518). She denied psychotic symptoms and her medications were continued. (Tr. 518). On December 28, 2009, Plaintiff reported that her surgery "went well," she was "doing better," and had a "good Christmas." (Tr. 517). She denied suicidal thinking and her medications were continued except for Seroquel, which was "too much for her." (Tr. 517).

The ALJ determined that Plaintiff became disabled as of January 5, 2010. (Tr. 14). By March 5, 2010, she was "continu[ing] to struggle with depression and

anxiety, not wanting to do things." (Tr. 516). She had a "lack of energy and hopelessness, irritability" and did not "want to go out." (Tr. 516). Her husband was frustrated by her lack of interest. (Tr. 516). She denied psychotic symptoms. (Tr. 516). Dr. Malik added Abilify to her medications. (Tr. 516). On April 27, 2010, Plaintiff was reporting that she was "doing okay for the most part," was "taking her medication," and felt the "medicine helps her." (Tr. 515). Her medications were continued. (Tr. 515).

On April 2, 2010, Plaintiff submitted a function report. (Tr. 226). She reported multiple present symptoms. (Tr. 226). With regard to her symptoms prior to March 31, 2006, she reported that she would "quit her job on the spot" if she had a problem with authority figures. (Tr. 224). She also indicated she was unable to "control [her] inner turmoil of emotions or express them at a job." (Tr. 224).

On June 25, 2010, Plaintiff reported that she was "not doing well." (Tr. 514). She was feeling "quite overwhelmed, anxious, and irritable," and her "Xanax [was] not helping her." (Tr. 514). She reported "a lot of mood swings, agitation, irritability, a lot of anxiety, and panic attacks" and was "making herself throw up." (Tr. 514). She had "not done well on the medication in terms of tolerability" and "tends to have difficulty with side effects." (Tr. 514). Dr. Malik restarted her Seroquel, switched her Xanax to Ativan, and continued her Lexapro. (Tr. 514). In July of 2010, Plaintiff reported the same symptoms, along with passive suicidal

thoughts. (Tr. 513). Dr. Malik increased her Lexapro and switched the Ativan to Klonopin. (Tr. 513). In August of 2010, she reported similar symptoms, but denied suicidal thoughts, and was doing a "little better." (Tr. 512).

On July 28, 2010, Plaintiff had a consultative exam with Dr. Cynthia Edwars-Hawver, Psy.D. (Tr. 427).  Her affect was "inappropriate and odd at times" and she "presented as very angry and was rude to the evaluator at the beginning of the evaluation." (Tr. 427). She explained that, after Plaintiff talked about her father and siblings, she "became hostile" and "stated 'Aren't you going to ask me about my mother? Why aren't you asking me about her?'" (Tr. 427). When asked "if she would like to talk about her mother, she stated 'no.'" (Tr. 427). She then relayed she was physically and emotionally abused by her mother. (Tr. 427). She stated that she does not have friends and that she does not do activities out of the home. (Tr. 427). She reported that she was laid off as after working part-time at the library because there was "not enough work for her." (Tr. 428).

Plaintiff reported that she had struggled with depression "since she was a child," but could "normally 'see the light at the end of the tunnel,' and knows things will get better," but in "June [of 2010] she became severely depressed and has not been able to pull herself out of it." (Tr. 428). She reported multiple symptoms of depression, including suicidal thoughts. (Tr. 428). She also reported "episodes of depersonalization" and visual and auditory hallucinations. (Tr. 428).

On exam, Plaintiff was "very angry" and irritated, "cursed repeatedly," and used "derogatory terms" to describe her prior psychiatrists. (Tr. 429). She "appeared to have a dissociative experience" about "half-way through the evaluation," where she went to table with ceramic frogs and "explained in a childlike voice, 'You have frogs! Can I touch them?'" This "lasted for approximately two minutes, and [Plaintiff] returned to sitting on the sofa and began talking in her normal voice." (Tr. 429).

Dr. Edwars-Hawver diagnosed Plaintiff with "Major Depressive Disorder, Recurrent, Severe With Psychotic Features." (Tr. 430). However, while she "reported past diagnoses of Borderline Personality Disorder and Dissociative Identity Disorder, it would not be clinically sound to diagnose these disorders only having met with Ms. Kane on one occasion." (Tr. 430). She did note that Plaintiff "did appear to dissociate in the office." (Tr. 430). She assessed Plaintiff a GAF of 35 and opined that her prognosis was "poor." (Tr. 430). She explained that "even with continued…treatment, [Plaintiff's] symptoms will likely persist for the rest of her life." (Tr. 430). She assessed marked limitations in Plaintiff's ability to interact with others, respond to work pressure, and respond to changes. (Tr. 431).

On September 21, 2010, Plaintiff reported to Dr. Malik that she was "doing well," that increasing Seroquel had been "helpful," and that "things [were] good at home." (Tr. 511). She was "quite bright and playful" and her medications were

continued. (Tr. 511). In November of 2010, Plaintiff reported her medication was helping her, but she was "hearing voices" and symptoms were "coming through." (Tr. 510). Her Seroquel was increased and her other medications were continued. (Tr. 510).

On October 12, 2010, Dr. Mark Bohn, M.D., evaluated whether Plaintiff was disabled from her physical impairments as of March 31, 2006. (Tr. 478). He noted that she had a mild lumbar strain in March of 2006, but it "resolved completely in four months and did not significantly affect her." (Tr. 478). He also noted that her subsequent exams were within normal limits and she did not complain of back pain. (Tr. 478). Thus, he opined that she was not disabled from her physical impairments prior to her date last insured. (Tr. 478).

On January 14, 2011, Plaintiff followed-up with Dr. Malik. (Tr. 529). She "reported that she is doing okay," was "taking her medication," and handled Christmas "well." (Tr. 529). She reported the combination of Lexapro and Seroquel had been helpful for her, she "lost some weight so she [felt] good about that," and she was "not hearing any voices." (Tr. 529). She still had "some periods of depression but overall she is doing good." (Tr. 529). Plaintiff saw Dr. Malik for medication management for fifteen minutes once every two or three months through August 15, 2011, reporting she was doing "good" or "okay" each time, and denying psychotic symptoms. (Tr. 526-28).

On January 30, 2012, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 24). She testified to multiple symptoms that were present at the time and had an episode where she talked in a "child like voice." (Tr. 27-40). With regard to her symptoms prior to March 31, 2006, she testified that she isolated herself and had to "get away from all kinds of stimulation." (Tr. 30). She testified that, in the workplace, she felt afraid of people, small, and "need[ed] to just look off and just rest for a while." (Tr. 30). She testified that she would overanalyze her workday and did not always want to be around her family. (Tr. 32). She testified that, prior to March 31, 2006, she would isolate herself in her bedroom when her in-laws would come over, and she "left [her] kids to deal with it." (Tr. 33). She testified that, prior to March 31, 2006, she was able to shop in stores, but that she was no longer able to shop in stores. (Tr. 36). She testified that, prior to March 31, 2006, "[t]here were some days [she] just knew [she] wasn't going to work, and a lot of times [she] didn't know why." (Tr. 38).

A medical expert also appeared and testified. (Tr. 41). He testified that she "seems like she's fairly stable on the Lexapro and the Klonopin." (Tr. 44). He testified that, as of her alleged onset in 2003 and date last insured in 2006, she did not meet or equal a Listing. (Tr. 45). He testified that "her record is pretty supportive of the fact that she carries on fairly…well" and disagreed with the consultative examiner's assessment. (Tr. 49). A vocational expert also appeared

and testified that, given the ALJ's RFC for a range of sedentary work prior to January 5, 2010, Plaintiff could perform work in the national economy. (Tr. 51-53).

On April 20, 2012, the ALJ issued the decision. (Tr. 18). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 1, 2003, the alleged onset date. (Tr. 12). At step two, the ALJ found that Plaintiff's depression and anxiety were medically determinable and severe as of February 1, 2003. (Tr. 12). The ALJ found that Plaintiff's back disorder and obesity were medically determinable and severe as of January 5, 2010. (Tr.12). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 13). The ALJ found that Plaintiff had the RFC prior to January 5, 2010 to perform a range of sedentary work. (Tr. 13). At steps four and five, the ALJ found that Plaintiff could not perform her past relevant work, but that she could perform other work in the national economy prior to January 5, 2010. (Tr. 16).

## VI.    Plaintiff Allegations of Error

### A. Assessment of Plaintiff's Onset Date

Plaintiff asserts that the ALJ erred in determining that her onset of disability was in January of 2010, not March 31, 2006, which was her date last insured. Plaintiff's onset date is crucial to the award of DIB benefits. As the Third Circuit has explained:

> However, under 42 U.S.C. § 423(a)(1)(A) and (c)(1), an individual is only
> eligible to receive disability insurance benefits if she was insured under the
> Act at the time of the onset of her disability. See also 20 C.F.R. §§ 404.130,
> 404.315(a); Kane v. Heckler, 776 F.2d 1130, 1131 n. 1 (3d Cir.1985). Here,
> the onset date of Appellant's disability is critical because it is determinative
> of whether she is entitled to benefits at all. See SSR 83–20, 1983 WL 31249,
> at *1 (1983). The ALJ determined, and the parties do not dispute, that based
> on Appellant's work history, the date when she was last insured was June 30,
> 1988. Therefore, to be entitled to disability benefits, Appellant was required
> to show that became disabled before this date.

*Perez v. Comm'r of Soc. Sec.,* 521 Fed.Appx. 51, 54 (3d Cir. 2013); *see also*

*Winger v. Barnhart,* 320 F.Supp.2d 741, 743 (C.D. Ill. 2004) (Claimant who

"worked only intermittently outside the home" and worked primarily as a

"homemaker" was not entitled to DIB benefits, and this denial did not violate

constitutional protections because "the quarters of coverage system: (1) makes the

Social Security program self-supporting, and (2) creates a method of limiting

Social Security benefits for those who have been dependent on their earnings.").

Thus, Plaintiff must establish that her onset of disability was prior to her date last

insured to qualify for DIB. Social Security Ruling[5] ("SSR") 83-20 states:

> In some cases, it may be possible, based on the medical evidence to
> reasonably infer that the onset of a disabling impairment(s) occurred some
> time prior to the date of the first recorded medical examination, e.g., the date
> the claimant stopped working. How long the disease may be determined to
> have existed at a disabling level of severity depends on an informed
> judgment of the facts in the particular case. This judgment, however, must
> have a legitimate medical basis. *At the hearing, the administrative law judge*

---

[5] "Social Security Rulings…are binding on all components of the Social Security
Administration." 20 C.F.R. § 402.35(b)(1).

> *(ALJ) should call on the services of a medical advisor when onset must be inferred.* If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

*Id.* (emphasis added).

Here, the ALJ complied with this requirement by calling a medical expert. (Tr. 41-50). *See Gibbs v. Comm'r of Soc. Sec.*, 280 Fed.Appx. 194 (3d Cir. 2008) ("[T]he ALJ properly followed SSR 83-20's requirements by calling a medical expert to help determine the onset date of [claimant's] disability"); *Mendes v. Barnhart*, 105 Fed.Appx. 347, 352 (3d Cir. 2004) (Testimony by a medical expert and medical records from treating physicians provided "evidence of the sort contemplated by S.S.R. 83–20"). The medical expert testified that Plaintiff was not disabled prior to March 31, 2006. (Tr. 41-50). This testimony provided the ALJ with substantial evidence to conclude that she was not disabled prior to March 31, 2006.

Even if the ALJ did not call a medical expert, substantial evidence would still support the onset date finding. *See Perez v. Comm'r of Soc. Sec.*, 521 Fed.Appx. 51, 56-57 (3d Cir. 2013) (Upholding ALJ's determination of onset, despite failing to elicit medical expert testimony, because the ALJ had medical records that "predated Appellant's claimed date of onset of disability," explaining "[w]e have generally…required the ALJ to call a medical expert where medical evidence from the relevant period is unavailable"); *Jakubowski v. Comm'r of Soc.*

*Sec.*, 215 Fed.Appx. 104, 108 (3d Cir. 2007) (Upholding the ALJ's determination of onset, despite failing to elicit medical expert testimony, because "the ALJ…had access to adequate medical records from the time period before the expiration of [claimant's] insured status, and these records did not support her alleged onset date.").

Here, Plaintiff continued working at a  library after her date last insured, and she reported in the consultative exam that she was "laid off" because there was "not enough work for her," not because she was unable to work due to disability. (Tr. 428). She was consistently diagnosed with depression "without psychotic features" during treatment with Dr. Silbert from 1997 to 2002 and in 2009 with Dr. Malik. (Tr. 537-562). Her treatment with Dr. Silbert was conservative, consisting of three months of treatment in 1997, nine months of treatment in 2000, a return to treatment in November of 2001, followed by only three visits in 2002. (Tr. 537-562). Plaintiff was not diagnosed with anxiety prior to 2006, except at her two art therapy sessions with Mr. Goryl on October 29, 2001 and January 21, 2002. (Tr. 563, 568). On March 10, 2006, three weeks before Plaintiff's date last insured, she referred to herself as a "homemaker/teacher." (Tr. 259). In notes from Family Practice from November of 2005 to February of 2008, the first time Plaintiff mentions increased depression is February 21, 2008. (Tr. 331-35). There was no subsequent mention of depression or anxiety, and on July 20, 2009 and August 27,

2009, she denied depression, anxiety, anger, moodiness, and problems with memory or concentration. (Tr. 329).

In September of 2009, Plaintiff reported that she had "doing well" with "Lexapro and Xanax *for years now*," and "want[ed] to continue the same thing." (Tr. 271) (emphasis added). She reported "at some point [she] had a history of hearing voices and issues of multiple personality disorder and borderline personality traits" but "since she has been taking medicine that has helped her." (Tr. 271). Dr. Malik's records show that Plaintiff was "doing alright," things were "going well," and she denied psychotic symptoms in November of 2009, except that she was anxious about her upcoming neck surgery. (Tr. 518). She was "doing better" after her "surgery went well" in December of 2009, and denied psychotic symptoms. (Tr. 517).

However, by March of 2010, she was reporting increased symptoms, "not wanting to go out," "lack of energy and hopelessness, irritability," and problems with her husband, so Plaintiff added Abilify to her treatment regime. (Tr. 516). Plaintiff continued to deteriorate thereafter, and began reporting psychotic symptoms. (Tr. 510). Dr. Edwars-Hawver diagnosed Plaintiff with depression "with psychotic features" in July of 2010, which contrasts with Dr. Silbert's diagnosis of depression "without psychotic features" prior to 2006. (Tr. 430, 537-

62). Thus, the record supports the ALJ's conclusion that Plaintiff suffered a deterioration in her mental impairment in early 2010.

Plaintiff asserts that the consultative examiner's opinion should have been credited over the opinion of the medical expert who testified at her hearing because "[t]he opinion of a non-examining physician should carry little to no weight." (Pl. Brief at 3-9). However, it is well-settled that an ALJ may accept the opinion of a non-examining physician as long as the ALJ does not reject evidence for "no reason or the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993). Moreover, the consultative examiner declined to opine as to Plaintiff's earlier condition because "[i]t would not be clinically sound to diagnose these disorders only having met with Ms. Kane on one occasion." (Tr. 430). Thus, the consultative examiner did not address Plaintiff's condition prior to March 31, 2006. In contrast, the medical expert who testified at the hearing had the benefit of reviewing Plaintiff's longitudinal treatment record, and opined that she was not disabled prior to March 31, 2006. (Tr. 41-50).

Finally, Plaintiff relies on her testimony that she was experiencing problems that caused her to have problems at work prior to March 31, 2006. (Pl. Brief at 12). Plaintiff asserts that the ALJ erred in "disregarding" her testimony. (Pl. Brief at 12-13). However, the ALJ acknowledged, and rejected, this testimony to the extent it was inconsistent with his RFC. (Tr. 14). He relied on Plaintiff's report to Dr. Malik

that she had been "treated for many years with Lexapro and Xanax, with good results." (Tr. 14). The ALJ properly found that this contradicted Plaintiff's claims that her symptoms had been present and sufficiently severe to preclude her working prior to March 31, 2006. (Tr. 14); *see* SSR 96-7p; *cf. Mendes v. Barnhart*, 105 Fed.Appx. 347, 352 (3d Cir. 2004) (ALJ's determination of onset lacked substantial evidence because claimant testified she was disabled prior to onset date and "[t]he ALJ did not reject Mendes's…testimony on credibility grounds"). The ALJ also relied on the medical expert's testimony and specifically noted that she was "stable on psychotropic medications." (Tr. 15). As discussed above, this reliance was proper. SSR 83-20. Again, this contradicts Plaintiff's claims that she was unable to work due to her symptoms prior to March 31, 2006. The ALJ was entitled to credit the medical expert's testimony.

Thus, the ALJ properly based his finding regarding Plaintiff's onset date on medical expert testimony. Substantial evidence supports his conclusion that Plaintiff was not disabled prior to March 31, 2006.

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552;

*Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the

report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: February 13, 2015                    _____s/Gerald B. Cohn_____
                                            GERALD B. COHN
                                            UNITED STATES MAGISTRATE JUDGE